## HARRISON et al. v. MILLER et ux.

No. 5850.   Decided March 11, 1937.   (65 P. [2d] 643.)

*Christenson, Straw & Christenson,* of Provo, for appellants.

*Geo. S. Ballif,* of Provo, for respondents.

PRATT, District Judge.

On April 11, 1927, the Harrisons and the Millers entered into a written contract. The Millers agreed to pay the Harrisons $3,000 with interest at 6 per cent in monthly installments of $25 for a house and lot owned by the Harrisons. They also agreed to pay the taxes and keep the place insured. The contract contained a repossession clause for failure to pay taxes, or to keep the place insured, or upon a default in two monthly installments.

In December, 1928, and January, 1929, with the consent of the Harrisons, two payments were missed in order that the Millers might pay the taxes. In 1929, the Harrisons paid delinquent taxes which should have been paid by the Millers. In 1932, at the request of the Millers, the Harrisons reduced the monthly payments to $20. The Millers failed to pay the 1932, 1933, and 1934 taxes. The Harrisons also paid one of the insurance premiums upon the house. The $20 per month payments were continued until and including May,

1934. In June of that year, Millers made a payment of $11 only. Being unable to continue with the payments, the Millers at the suggestion of the Harrisons made an application to the Home Owners' Loan Corporation (we shall hereafter speak of it as the HOLC) for a loan. There was considerable dickering back and forth with that company until March, 1935. The Millers, however, paid nothing to the Harrisons during this period. On the date last mentioned, the Harrisons signed a written consent to take HOLC bonds in the sum of $1,725 plus $25 in settlement of the contract. This consent was one of the regular forms of the HOLC and contained the following clause:

"* * * this consent * * * shall be binding for a period of 30 days from date and thereafter until 10 days written notice shall have been given the State Manager of the Corporation."

After this consent was signed, the Harrisons, in order to expedite the loan, paid some $200 for repairs upon the place. Again the matter dragged along until August 27, 1935. The Harrisons became dissatisfied and apparently were in need of money. On that day they notified the HOLC and the Millers of their withdrawal of their consent. We find the following in this notice:

"We are authorized to notify you that if this loan is closed and if the bonds can be delivered within a period of two weeks from the date hereof they will be accepted in accordance with the previous arrangement. You will please take notice however that Mr. Harrison desires and does hereby cancel and withdraw his agreement to take bonds effective on September 11, 1935. If the bonds are delivered prior to that date they will be accepted as indicated; if on that date however the bonds have not been delivered you are notified that Mr. Harrison will consider all obligations to receive them at an end, * * *"

On August 30th, the time limit of September 11th was extended to September 15th, but as this day fell on Sunday, the parties agreed that the last day should be the 16th of September. On September 14th, and again on September 16th, an instrument called a "bond authorization" was of-

fered to the Harrisons. At the same time they were presented with another written consent for their signature giving an additional 30 days' time within which to deliver the bonds. These bonds had to come from Washington, D. C. All parties agree that it was known at that time that the bonds could not be delivered by the 16th of September. The signing of the consent was made a condition precedent to the actual delivery of this bond authorization. The latter instrument was an order which, when presented to a designated bank, would entitle the vendor to the delivery of the bonds upon their arrival from Washington, D. C. The Harrisons refused to sign the consent, refused to execute their deed, and refused to take the bond authorization.

On September 27, 1935, the Harrisons gave the Millers a 45-day written notice to pay up the defaults or get out. The Millers refused to do either, and this suit was commenced by the Harrisons to regain possession of the premises, to cancel the agreement of April 11, 1927, and to quiet title to the premises. The original contract had been recorded. The Millers counterclaimed, setting up the facts as we have outlined them as new agreements and demanding specific performance. The lower court held with the Millers and the Harrisons appeal.

In passing, may it be said that the lower court gave the Millers 90 days in which to present their bonds and cash, and if they did not in that time, then gave them judgment for $750 as their equity in the premises and directed that this sum should be paid by the Harrisons before the Millers would be required to relinquish the property. This decision is rather unusual in view of the fact that the Millers offered to go through with the bond deal and maintained that they were ready, willing, and able to carry out their end of it. Apparently the lower court recognized the fact that as to whether or not they were ready, willing, and able to perform was questionable. No one knew for a certainty that the HOLC loan could be resurrected, it having been placed in

the HOLC rejected files. However, this matter becomes immaterial in view of our opinion of the case.

The principal controversy between the parties arises over the finding of the lower court that the Millers "tendered the said $1725.00, the proceeds from said Home Loan, to the plaintiffs on September 14, 1935, and again on September 16, 1935." This is inaccurate, as no one contends that cash or a check in that sum was offered. The Millers contend that the offer of the bond authorization was the same as the offer of the bonds; the Harrisons contend that it was necessary that the bonds themselves actually be tendered. There is no controversy between the parties over the right of the Harrisons to withdraw their consent to take bonds in accordance with the terms of the consent; nor is there any controversy but that a notice of withdrawal was given as we have set out above. The question thus simmers down to what was meant by that notice in view of the knowledge of both parties as to the procedure of the HOLC. Let us consider that notice, and in doing so we will cover the HOLC procedure so far as it is material to this issue.

There were two conditions imposed by the notice:

(1) "If the loan is closed" and (2) "if the bonds can be delivered."

Both were required to be done within the time limit of September 16. Another form of wording them might have been this: If the loan can be closed in time to get the bonds here by September 16th, they will be accepted in accordance with the previous arrangement.

Closing the loan, so far as the Harrisons were concerned, consisted of the delivery of the bond authorization, the signing of the written consent for a 30-day extension, and the delivery of the Harrisons' deed. Naturally, if the deed were not delivered, the bond authorization would not be delivered and the loan could not be closed. The Millers contend that the trouble has arisen not only from the refusal to accept the authorization as the equivalent of the bonds but from the

refusal to deliver the deed which made it impossible to close the loan.

On September 14th and 16th we find that all that was offered was the closing of the loan—a compliance with the first condition of Harrisons' notice of withdrawal. Admittedly, as evidenced by the presentation of the new consent at this time, the bonds could not be delivered for a period, according to the testimony, of two weeks or more. The 30-day extension proposed by the HOLC would indicate even longer. Under such circumstances, of what avail to the Harrisons was the delivery of the deed? The whole matter had dragged along under the HOLC rules and regulations since June, 1934. Why should the Harrisons be compelled to let it drag longer, especially after they had given notice of their intention— a notice they had the right to give under the HOLC rules and regulations. Had the tender been made to the Harrisons earlier in the transactions leaving a reasonable time for the delivery of the bonds, their refusal might have been at their peril; but not when it was unquestionably impossible to comply with the notice. It is our opinion that under such circumstances the Harrisons were clearly within their rights in refusing to deliver the deed, to sign the consent and accept the bond authorization. The evidence discloses that the bond authorization was not equivalent to the bonds. It did not have the same immediate monetary value.

What we have said practically disposes of this case, but certain other matters are argued that may be of some materiality so far as the preparation of findings is concerned. The Millers contend that the reduction of the installments to $20 per month together with an agreement, as they allege it to be, that payments in default were to be added to the principal and paid later, constituted a new contract. Also that the agreement to take HOLC bonds constituted a binding agreement between the parties. The last contention has support in the case of *Boshart* v. *Gardner*, 190 Ark. 104, 77 S. W. (2d) 642, 96 A. L. R. 1130, and its annotations. This we

need not decide. But the fact, if it be a fact, that such an agreement with the HOLC does make a binding agreement as between the mortgagor and mortgagee or the vendor and vendee is of no benefit to the Millers in this case, as they lose by the very terms of that binding agreement: The right to withdraw consent upon certain conditions.

As to the contention of the Millers based upon the reduction of the monthly installments, we are not inclined to agree that the facts of this case justify such a holding. It is extremely questionable that any intention to modify the contract of April 11, 1927, existed in this case, to modify it in the sense of making a new binding contract with lower installments. Strange as it may seem to some, there is such a thing as taking advantage of the creditor and using his leniency or his willingness to help out against him. Does it seem reasonable that a vendor of real estate will bind himself to accept installments in an amount less than the reasonable rental value per month of the premises ($22.50 per month seems justified from the testimony as the reasonable rental value), keeping in mind that he has not received under his contract a cash down payment in excess of one of the installments, and at the same time cover all delinquencies, such as taxes, that may occur during the course of the contractual relationship? He might be willing to do so for a definite period, or he might be willing to reduce payments temporarily to afford the purchaser an opportunity to get on his feet. But one can hardly expect him to bind himself for an indefinite period, indefinite by reason of the fact that it would be changed from time to time as delinquencies accumulated. Keep in mind that the change in installments occurred in July or August, 1932. Subsequent to that time the 1932 and 1933 taxes became delinquent. We do not mention those of 1934 by reason of the fact there was some contention they were to be covered in the HOLC loan. As these taxes became delinquent, the vendor would of necessity have to advance them or subject his property to sale for taxes. Considering these facts together, can it be said

the parties intended any definite binding modification of the contract of April 11, 1927? The facts of this case as a whole indicate merely a temporary reduction for the benefit of the Millers without any thought or intention on the part of the Harrisons to bar themselves from the benefits of the original contract. Most certainly they did not take an unfair advantage of the Millers. (Incidentally, the Millers admit in their applications to the HOLC that they are in default. They do not contend in those instruments that there was any different contract than that of April 11, 1927).

What has been said immediately preceding is also involved to some extent in the question of the equities in the case. It is true that the collapse of the relationship cannot be laid at the door of the Millers. Both parties were somewhat tied up in the rules and regulations of the HOLC. The Millers have occupied the premises free of payment for some period. They made payments for two years in an amount less than the reasonable rental value of the premises. They allowed the taxes to become delinquent and the burden of the payment of these fell upon the Harrisons. It is also disclosed from the testimony that there were occasions when the Harrisons receipted for installments and then returned them to aid the Millers. Under the circumstances we can see no inequity in deciding the case in favor of the Harrisons.

The judgment is reversed, and the case is remanded to the lower court, with directions to that court to make findings, conclusions, and decree to conform to this opinion; the appellants to recover the reasonable rental value of the premises from and after the date of the expiration of the 45-day notice. Appellants to recover costs.

FOLLAND, C. J., and HANSON, MOFFAT, and WOLFE, JJ., concur.

LARSON, J., being disqualified, did not participate herein.